NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241255-U

NO. 4-24-1255

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 21, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| JOHNNIE L. SIMS, | ) | No. 15CF726 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court
Justices Zenoff and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court properly dismissed defendant's postconviction petition alleging ineffective assistance of counsel.

¶ 2     Defendant Johnnie L. Sims was convicted of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2014)), and his conviction was affirmed on direct appeal. He filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), asserting, among other issues, that his trial counsel was ineffective for failing to bring a motion to suppress the firearm in question. The circuit court dismissed the petition because defendant's version of events was contradicted by the record, so the matter did not proceed to an evidentiary hearing. Defendant's appeal relates only to counsel's alleged ineffectiveness on the suppression issue. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                A. Trial and Direct Appeal

¶ 5        The indictment here alleged that defendant "knowingly had in his possession a firearm, being a handgun, and the defendant has been previously convicted of the offense of unlawful possession of a controlled substance in Peoria County, Illinois Case 2002 CF 1214."

¶ 6        At trial, the evidence showed that at approximately 11 p.m. on October 26, 2015, defendant called police as he was moving out of the house where he stayed with his ex-girlfriend, Shenita Brown. He could not find his car keys and believed Brown had hidden them. Numerous officers came to the scene, including a supervising officer and Officers Adams, Nicholson, and Skaggs. Defendant was yelling, angry, and dissatisfied with the police who arrived, causing him to repeatedly call police dispatch.

¶ 7        Adams went inside to search for the keys with Brown and returned with them moments later. The officers told defendant he was free to go, but he asked for their continued presence as he packed his things into the car; the officers agreed.

¶ 8        Despite the fact that there were policemen standing around his car, defendant twice locked his car doors when he went inside the house to collect his belongings. During his third trip to the house for his belongings, the car was unlocked and at least one of its doors was left open. Brown informed the officers present that defendant had a gun underneath the driver's seat. Defendant stated if there was a gun, Brown had placed it there.

¶ 9        Regarding the search that ensued, Adams testified as follows:

"Q. What happened as you were watching the defendant—as the defendant moved things into his car?

A. In the process of him putting things in the vehicle, Ms. Brown came up and stated that Mr. Sims had a handgun under the driver's seat. Mr. Sims had heard her say that and immediately stated there was no weapon in the vehicle; and, that if

there was, she had planted it in the vehicle.

> Q. Did Mr. Sims tell you to look?
>
> A. Yes, he did.
>
> Q. Did you do so?
>
> A. Yes, I did.
>
> Q. Did you look under the driver's seat?
>
> A. Yes.
>
> Q. Was there a gun there?
>
> A. No, there was not.
>
> Q. Was there a gun somewhere in the car?
>
> A. In the center console there was a gun."

Adams also testified that he conducted the search from the driver's side while officer Nicholson was at the front passenger door.

¶ 10    Defendant later testified as follows:

> "Q. Did there come a time when one of the officers asked you if he could search the car?
>
> A. No. At this point, prior to the officer asking to search, he didn't really ask me to search the car. On my third load coming from off the porch of the house going to the car, I can overhear Shenita Brown telling Officer Adams he got a gun. They told me I was free to go. She tellin' this officer, well, if you look under the seat, there's a gun under the seat.
>
> Q. And did the officer then ask you to search?
>
> A. The officer went around—well, the doors were already open. So, he

walked around to the vehicle and went to lookin' on the floorboard where she said

the gun was supposed to have been. No gun. So, then I said, I says, what are you,

what, I says, Officer Adams, she said the gun is under the seat. What are you doin'?

Q. Did you tell the officer—

A. I didn't tell the officer that he could search the car. I don't have

permission to tell him he could search that car.

Q. While you were standing there, did you see the officer recover the

handgun?

A. I was standing besides Officer Nicholson on the sidewalk. Officer

Adams went inside the console I believe it was. The console. He was in there quite

a few, you know, diggin' around, shufflin' around. All of a sudden, I seen him do

this. (Indicating.) When I seen him do that, that's when I told officer, I think it was

Nicholson, that that's my son's gun."

Nobody else, including the other officers on the scene, testified as to the exact circumstances of

the consent given, nor was there a recording of the conversation entered into evidence.

¶ 11         The jury found defendant guilty, and the circuit court sentenced him to seven years'

imprisonment in the Illinois Department of Corrections, followed by one year of mandatory

supervised release.

¶ 12         On direct appeal, defendant raised numerous issues, including ineffective

assistance of counsel, but he did not raise ineffectiveness in relation to the suppression issue. We

affirmed his conviction. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 62, *pet. for leave to appeal*

*denied*, No. 125240 (2019).

¶ 13                              B. Postconviction Proceedings

¶ 14    In June 2019, defendant filed a *pro se* petition for postconviction relief pursuant to the Act. He alleged his counsel was ineffective in multiple respects, including the suppression issue now presented on appeal. He attached numerous exhibits to the *pro se* petition, including a letter to the clerk, five letters written to his appellate defender, trial transcript excerpts, three motions to dismiss, and a motion *in limine*. He also filed an affidavit with his petition that listed these exhibits.

¶ 15    The circuit court conducted a first-stage inquiry and determined that the claims merited appointment of counsel, advancing the petition to the second stage. The court noted in its order that "some of the issues therein would not survive stand alone analysis." Appointed counsel filed a motion to withdraw, arguing that the postconviction claims were without merit and frivolous. The State subsequently filed a motion to dismiss. The court granted both motions.

¶ 16    Defendant appealed, arguing that his postconviction counsel failed to comply with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) because his motion to withdraw failed to address all of defendant's claims. The State confessed error and the appellate court remanded.

¶ 17    Defendant's counsel filed an amended postconviction petition, which had no exhibits. A few months later, defendant's counsel filed a second amended postconviction petition, stating as follows:

> "After Petitioner recovered his keys, and while he was loading his belongings into the car, Ms. Brown told police that Petitioner had a firearm under his driver's seat. Petitioner disclaimed the possession of any firearm and, according to the police, gave consent to 'take a look' under the seat to make sure one had not been planted there. According to Petitioner, he never gave even that limited consent: he asked one officer if they wished to take a look under the seat and that

officer declined. Then, a different officer decided to conduct a search without asking permission. The second officer found no firearm under the seat and proceeded to search the car's interior. Upon opening the center console, the officer found a .380 pistol and arrested Petitioner. Petitioner denied knowledge that the gun was there, but informed police that he recognized the firearm as belonging to his stepson. Subsequent investigation found that the gun was indeed registered to Petitioner's stepson.

Although Petitioner informed trial counsel that he had not consented to the warrantless search, and that the officer had done more than 'take a look' under the driver's seat, trial counsel failed to file a motion to suppress evidence. Additionally, based on this record, there was no indication that officers were aware of Petitioner's criminal history when they placed him under arrest for possession of a firearm. Notably, Petitioner's arrest occurred after [the Illinois Supreme Court's decision in *People v. Aguilar*, 2013 IL 112116] invalidated the sections of the unlawful use of a weapon statute regarding public possession of firearms but before a constitutional version of that statute could be re-enacted."

¶ 18 The petition's only exhibit was defendant's notarized affidavit stating, in pertinent part, as follows:

"I, Johnnie Lee Sims, hereby declare under penalty of perjury that the following is true and correct based upon my personal knowledge and that I am competent to testify to the following:

1. I have read the second amended post-conviction petition and confirm that all statements therein are true and accurate to the best of my knowledge.

2. Prior to trial in this case, I met with my attorney and his co-counsel to discuss strategy. I informed my attorney that I had not consented to the search of my truck [crossed out and replaced with "car" and respondent's initials] and asked him to file a motion to suppress evidence. My attorney refused to file the requested motion."

Defendant did not attach corroborating affidavits from Brown or the officers at the scene.

¶ 19 The State responded with a motion to dismiss the second amended petition. During the hearing on the motion, defendant's counsel described the exchange leading up to the search of the car as follows:

"So, for example, if he says, take a look, and he's not clear who he's talking to and that's what comes out at the hearing, then maybe that does apply to both officers.

But based on what we have here, what Mr. Sims has recalled, what he relayed to his attorney, that's not what happened. He's speaking to one officer. The ex-girlfriend is saying something about a gun. He's like, there's no gun in the car, you want to take a look?"

¶ 20 The circuit court ultimately granted the motion to dismiss, reasoning that the allegations in the petition regarding the suppression issue were contradicted by the record.

¶ 21 This appeal followed, in which defendant raises the claim of his attorney's ineffectiveness only with respect to the suppression issue.

¶ 22                                 II. ANALYSIS

¶ 23                                 A. The Act

¶ 24        The Act provides a three-stage process for a criminal defendant to claim that a substantial violation of his federal or state constitutional rights occurred at the proceedings which resulted in his conviction. *People v. Tate*, 2012 IL 112214, ¶ 9; *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997). At the first stage, the circuit court must review a *pro se* petition within 90 days and may dismiss it if it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a) (West 2018). Petitions that are not summarily dismissed advance to the second stage, where counsel is appointed. *Id.* § 122-4. Petitions that make a substantial showing of a constitutional violation at the second stage advance to a third-stage evidentiary hearing. *Tate*, 2012 IL 112214, ¶ 10.

¶ 25                                 B. Defendant's Petition

¶ 26        Defendant argues his petition should not have been dismissed because he made the requisite substantial showing that his trial counsel was ineffective for failing to pursue the suppression issue. Defendant contends that when the circuit court stated that the allegations of the petitions were contradicted by the record, the court impermissibly assessed the credibility of conflicting testimony, *i.e.*, the officer's trial testimony that defendant consented to a search and defendant's that he did not. We agree that no credibility determinations can be made at the second stage. However, defendant's own petition and affidavit provide additional information about the consent he gave to search the car. Defendant essentially concedes that *some degree* of consent was given, but he argues that the search was outside the scope of that consent. It is in this context that we evaluate whether defendant has made a substantial showing of a constitutional violation.

¶ 27        The substantial showing requirement "is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary

hearing, would entitle petitioner to relief." (Emphasis in original.) *People v. Domagala*, 2013 IL 113688, ¶ 35. A petitioner bears the burden to make a substantial showing. *People v. Dixon*, 2018 IL App (3d) 150630, ¶ 12. "[T]he ultimate question regarding the sufficiency of the allegations contained in a post-conviction petition merits treatment as a legal inquiry requiring plenary appellate review," and "there is little justification for deference to be given to the circuit court's conclusions as to the sufficiency of a petition's allegations." *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998); *People v. Addison*, 2023 IL 127119, ¶ 17 (applying *de novo* review).

¶ 28 In assessing whether defendant made a substantial showing, we look to the legal test underlying the claim of ineffective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Domagala*, 2013 IL 113688, ¶ 36. "Whether to move to suppress evidence generally is a matter of trial strategy" entitled to great deference. *People v. Shelton*, 2020 IL App (2d) 170453-B, ¶ 16 (citing *People v. Little*, 322 Ill. App. 3d 607, 611 (2001)); *People v. Bew*, 228 Ill. 2d 122, 128 (2008). Courts presume that trial counsel had a legitimate strategy for whether to file a motion to suppress. *Shelton*, 2020 IL App (2d), ¶ 16. With respect to the second *Strickland* prong—showing prejudice from the failure to file a motion to suppress—"a defendant must demonstrate that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Webb*, 2023 IL 128957, ¶ 23 (citing *People v. Henderson*, 2013 IL 114040, ¶ 15).

¶ 29 1. *Adequacy of Counsel's Representation*

¶ 30    As noted above, the first question presented under *Strickland* is whether trial counsel's failure to file a motion to suppress rendered his performance deficient. In conducting this inquiry, we are to avoid the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. However, the petition's allegations show numerous reasons why counsel might have doubted that a motion to suppress would succeed, a judgment that falls within the established bounds of trial strategy. For example, defendant's affidavit states that he "asked [his attorney] to file a motion to suppress evidence," but that his "attorney refused to file the requested motion." This demonstrates that counsel actually contemplated the issue, rather than missing it completely, which further suggests the decision not to seek suppression was one of strategy. See *People v. Campbell*, 2014 IL App (1st) 112926, ¶ 47 (when counsel initially filed a motion to suppress and spoke with the defendant about it, but later abandoned it, "trial strategy rather than incompetence dictated trial counsel's decision not to litigate" the motion).

¶ 31    Furthermore, other than defendant's self-generated testimony, the petition has no corroborating evidence, such as affidavits from those who were present, including Brown and the officers. While it may be inappropriate for the trial judge to weigh conflicting testimony at the second stage of a postconviction proceeding, it would not have been inappropriate for trial counsel to have considered the strength of the evidence and the lack of corroboration when deciding whether to file a motion to suppress.

¶ 32    For these reasons, and others described below, defendant's allegations fail to overcome the presumption of trial strategy, which is entitled to significant deference.

¶ 33                    2. *Prejudice/Likelihood of a Successful Motion*

¶ 34    Under the second prong of *Strickland*, defendant must demonstrate the unargued suppression motion would have succeeded and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed.

¶ 35    Defendant primarily argues that he did not consent to a search of his car and that, absent a warrant or probable cause, he is entitled to suppression of any evidence discovered during the search. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida. v Jimeno*, 500 U.S. 248, 251 (1991). Because the test is objective, it is not based on the subjective intention of the consenting party.

¶ 36    The trial record reflects that Brown told Adams that there was a gun in the vehicle under the driver's seat, a point neither party disputes. It further contains Adams's testimony that defendant "[told him] to look" for the gun, describing no limitation on the scope of defendant's permission. While it would be improper to credit Adams's testimony over conflicting testimony, we must also examine carefully what defendant alleges the conflicting testimony would be. Courts are to interpret the petition's allegations liberally, accepting as true all factual allegations not positively rebutted by the record and taking all reasonable inferences in favor of defendant. *Coleman*, 183 Ill. 2d at 382; *People v. Childress*, 191 Ill. 2d 168, 174 (2000). Under that standard, the description of what was actually *said*, as set forth in defendant's own petition, supports a finding of consent under the objective reasonable-person test. Defendant's petition says that he "asked one officer if they wished to take a look under the seat." He does not allege that he told the officer that he could take a look *only* under the seat, *i.e.*, he did not express to the officer that his consent to search was limited to the specific location mentioned by Brown.

¶ 37      Furthermore, it was clear that the object of the search was not the floorboard itself, but the firearm, which the officer could reasonably deduce might be within the adjacent center console. See *Jimeno*, 500 U.S. at 251 (stating that in the context of a consent to search, "[t]he scope of a search is generally defined by its expressed object") (citing *United States v. Ross*, 456 U.S. 798, 824 (1982)).

¶ 38      While defendant looks for support from *People v. Baltazar*, 295 Ill. App. 3d 146 (1998), we find that case is of no assistance to him. First, its facts are distinguishable, as the search here pertained to a specific object. In *Baltazar*, when a driver allowed a police officer to " 'take a look' " into a trailer, without any specification as to the item being searched, the consent did not extend to cutting open three boxes in the trailer, which had been taped shut. *Id.* at 151. Here, defendant and police were searching for a gun when the officer looked into an unlocked console adjacent to the floorboard area. Second, *Baltazar* actually provides a useful summary of authority that explains, in part, why the search was permissible on this record:

> "[C]ourts have determined that an officer may search smaller containers found inside the larger area being searched if it would be objectively reasonable to find the stated object of the search in that smaller container. See *Jimeno*, 500 U.S. at 251 *** (defendant's consent to search his car included search of a small paper bag found in the car because he was informed that the officer suspected that he possessed narcotics); *Phillips*, 264 Ill. App. 3d at 222, 201 Ill. Dec. at 692, 636 N.E.2d at 1124 (defendant's consent to search of his motorcycle included search of a jacket located in the rear cargo area when the express object of the search was narcotics); *United States v. Lechuga*, 925 F.2d 1035, 1042 (7th Cir. 1991) (consent to search unfurnished apartment included search of suitcase in closet because the

express purpose of the search was drugs); *Rich*, 992 F.2d at 506–07 (defendant's consent to the officer's request to look in his truck included suitcase located behind the passenger seat because the officer had just asked the defendant if he had any narcotics in the truck)." *Id.* at 150. Here, defendant's own words gave consent to search *at least* the floorboard for the gun; absent an expression of limitation of that consent by defendant, the officer's search of an adjacent space in which the object of the search might have been plausibly located is within its scope.

¶ 39    Defendant's remaining allegations are insufficient to support his limited consent theory because they are largely conclusory; they convey his subjective conclusions about his intentions rather than the actual words used during the exchange. See *Coleman*, 183 Ill. 2d at 381 ("Nonfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act.") (citing *People v. West*, 43 Ill. 2d 219, 223 (1969)). In particular, defendant's new allegation that he did, in fact, give some degree of consent reveals that his trial testimony—where he said he did "not tell the officer that he could search the car"—was apparently defendant's *conclusion* about the legal effect of what he said, not the actual words spoken. Additionally, his curious trial testimony that he didn't "have permission to tell him he could search that car" again suggests a legal conclusion rather than an expression to the officer that his consent was limited in some way. Taking the *facts* as alleged by defendant about what he actually *said* to the officer, the authorities cited in *Baltazar* suggest that his consent to search for the gun under the seat was not inherently limited to precisely that location.

¶ 40    Defendant also argues that any prior permission given to one officer to "take a look" does not apply to other officers. This is legally incorrect. Under the objective, reasonable-person test, granting permission to "take a look," even if directed at one officer, could not so arbitrarily

limit the scope of consent in the way defendant suggests, especially when other officers were present. Defendant's argument that there is some meaningful distinction under the law between consent to search being given to one officer as opposed to another is meritless. See *United States v. Rubio*, 727 F.2d 786, 797 (9th Cir. 1983) ("We are unpersuaded that a consent search may be validly qualified by the number of officers allowed to search, and we so hold."); *cf. People v. Whiles*, 2024 IL App (4th) 231086, ¶¶ 29-37 (discussing *United States v. Hensley*, 469 U.S. 221 (1985) and applying the collective knowledge doctrine to hold that one officer's knowledge was collectively imputed to another officer to support probable cause).

¶ 41        Finally, the record does not support a subsequent revocation of the consent given. Once Adams began searching the console, defendant stating, "[w]hat are you doin'?" is too vague to constitute revocation. Federal courts interpreting the fourth amendment have held that revocation of consent must be clear and unambiguous. *United States v. Ross*, 263 F. 3d 844, 846 (8th Cir. 2001) (collecting cases).

¶ 42        Consequently, defendant failed to make the substantial showing of a constitutional violation necessary to entitle him to an evidentiary hearing.

¶ 43                              III. CONCLUSION

¶ 44        For the reasons stated, we affirm the circuit court's judgment.

¶ 45        Affirmed.